UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DWAYNE STANLEY IVEY, II,

                                                    Petitioner,

v.

DANIEL PARAMO, Warden,

                                                    Respondent.

Case No.:  14-cv-715 MMA (JLB)

**REPORT AND RECOMMENDATION DENYING PETITION FOR WRIT OF HABEAS CORPUS**

**[ECF No. 1]**

## I. INTRODUCTION

Presently before the Court is the petition for writ of habeas corpus ("Petition") of Dwayne Stanley Ivey, II, a state prisoner proceeding *pro se*.  (ECF No. 1.)  Respondent filed an answer to the Petition (ECF No. 6), and Petitioner filed a traverse (ECF No. 12).

United States Magistrate Judge Jill L. Burkhardt submits this Report and Recommendation to United States District Judge Michael M. Anello pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule HC.2 of the Local Rules of Practice for the United States District Court for the Southern District of California.  After a thorough review of the pleadings and supporting documents, and for the reasons set forth below, the Court **RECOMMENDS** the Petition be **DENIED**.

1

# II. FACTUAL HISTORY

The factual background set forth below is excerpted from the California Court of Appeal's opinion in *People v. Ivey*, No. D059874 (Cal. Ct. App. Feb. 14, 2013).  (ECF No. 7-11.)  This Court gives deference to state court findings of fact and presumes them to be correct.  *See* 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35–36 (1992) (holding inferences properly drawn from state court findings of fact are entitled to statutory presumption of correctness).

*The Participants*

Trisha Davis has two daughters (L. and J.)[1] from previous relationships.  Davis married Ivey in 2004 and they produced a daughter (Je.).  Davis, Ivey and the three girls lived in an apartment in Lemon Grove (the Lemon Grove apartment) for approximately six months in 2006, and then moved to an apartment on Naranja Street in San Diego (the Naranja Street apartment) where they lived from July 2006 through August 2007.  The victim, L., turned 10 years old while the family was living at the Naranja Street apartment.

*The Lemon Grove Apartment Offenses*

L. testified that one night, while the family was living at the Lemon Grove apartment, Ivey woke her up and took her into the bathroom.  He lifted her onto the edge of a sink, directed her to pull down her pants, and then put his "private part" in her "over and over again."  At one point, L. heard her mother had awakened and was calling for her, and Ivey rushed L. back to her bedroom.  Ivey then returned to his bedroom.

Later that same night, Ivey returned to L.'s bedroom, woke her again, and took her back into the bathroom.  He had her pull down her pants, placed her on the edge of the tub, and put his "front part" into her "private area."  During one of the two bathroom incidents that night, Ivey also had L. put her mouth on his penis and ordered her to orally copulate him, and she complied.

After Ivey finished molesting L. in the bathroom, he took her into the living room and showed her a video of a "grown man doing a 15-year-old

---

[1] In compliance with Fed. R. Civ. P. 5.2(a)(3), only the initials of the individuals known to be minors are included in this Report and Recommendation.

2

girl" on his computer.  During the one or two minutes that they watched the video, Ivey had L. touch his "private area."  Afterward, he warned her not to reveal what had occurred, and L. never told anyone because she was "scared of what he might do."

Ivey molested L. on other occasions while living at the Lemon Grove apartment.  One day, he took her into her bedroom and put a purple dildo into her vagina, telling her it "wouldn't hurt as much if I used my private area."  On a different day, he picked her up from school, took her home, and again brought her into his bedroom.  He had her take off her pants and then "put his penis in her front part, and when he took it out, there was a whole bunch of white stuff that came out," which ended up on the bed.  He later directed her to turn over onto her stomach and then "did it in her back part."  When he finished, he threatened that "If you tell anybody, I will kill you."  There were times she wanted to scream while he was molesting her but could not because he put his hand over her mouth.

### The Naranja Street Apartment Offenses

After moving to the new address, Ivey continued to sexually abuse L. On at least two separate occasions when they were alone in the apartment, Ivey put his penis in her anus and into her vagina.  On another occasion, he digitally penetrated L.  He also forced her to orally copulate him on one occasion in the new apartment.  The pattern remained the same as before: he would direct her to take off her pants, direct her to assume various positions, and would cover her mouth to stifle any screams.

### The Initial Disclosures

L. eventually told her sister J. about the abuse.  They decided to record what happened in J.'s composition book and then show it to Davis.  Together, they wrote about the sexual abuse, as well as other misconduct towards them, excerpts of which they read to the jury.  Among the additional misconduct was that Ivey watched the girls while they showered, tried to bribe L., and physically abused L.  L. also testified that Ivey had once struck her on the head with a belt buckle with sufficient force to draw blood, had struck her in February of 2004, which left a knot on her head, and also injured her in June 2006.

Around the end of August 2007, as they were moving out of the Naranja Street apartment, L. and J. gave Davis the composition book.  By this point,

3

Davis had already decided to separate from Ivey because it had been a hard four-year marriage and "with all the domestic violence, abuse and just everything, and I'm the only provider, I was done."  After reading the book, Davis telephoned Ivey and confronted him but he denied the accusations. Davis testified she elected not to contact law enforcement because she had already moved away from Ivey and "he wouldn't be around her kids anymore."

### The Involvement of the Authorities

In April 2008 L. moved in with her biological father because she was having behavioral problems at home and school.  On March 8, 2009, she came into her father's bedroom, began to cry, and revealed what Ivey had done to her.  L.'s father called Child Protective Services, and Detective Williams, a child abuse detective with the San Diego Police Department, was assigned to the case.  On March 12, 2009, the day she was assigned the case, Detective Williams arranged to have L. interviewed by Ms. Olguin at the Chadwick Center, and a videotape of that interview was shown to the jury.

In June 2009 police searched Ivey's residence.  They found two vibrators and KY Jelly in the master bedroom.  They also found numerous pornographic DVD's, including one entitled "18 'n Nasty."  The prosecution played a one-minute clip of that video for the jury.

A pediatrician who conducted a forensic examination of L. testified there were "definitive findings for sexual abuse" involving a transection of the hymen, indicating "definite evidence that there was some form of blunt penetrating trauma."  The doctor testified that such a finding is "pretty rare," and that L.'s trauma was actually visible to the naked eye.  Among the hundreds of children she had examined in cases involving allegations of sexual abuse, it was the first time she had encountered a child with that presentation.

(ECF No. 7-11 at 2–6.)[2]

---

[2]  All citations to page numbers in this Report and Recommendation refer to the page numbers assigned by the CM/ECF system.

### III. PROCEDURAL HISTORY

On September 14, 2010, the San Diego District Attorney filed a second amended information charging Petitioner with five counts of committing a lewd act upon a child in violation of California Penal Code section 288(a) (counts one, two, three, five, and six), one count of showing a harmful matter (pornographic video) to a minor with the intent of seducing the minor in violation of California Penal Code section 288.2(a) (count four), four counts of sexual intercourse/sodomy with a child 10 years old or younger in violation of California Penal Code section 288.7(a) (counts seven, eight, nine, and ten), and two counts of oral copulation/sexual penetration with a child 10 years old or younger in violation of California Penal Code section 288.7(b) (counts eleven and twelve). (ECF No. 7-1 at 16–20.) As to counts one, two, three, five, and six, it was further alleged Petitioner had substantial sexual conduct with a child under 14 years of age within the meaning of California Penal Code section 1203.066(a)(8) while committing a lewd act upon a child. (*Id.* at 17–19.) As to count three, it was also further alleged Petitioner used matter depicting sexual conduct within the meaning of California Penal Code section 1203.066(a)(9) while committing a lewd act upon a child. (*Id.* at 18.)

Petitioner pleaded not guilty to all charges and received a jury trial in the San Diego County Superior Court in case number SCD220783. (ECF No. 7-2 at 41.) On the court's own motion, count 4 and the second special allegation included in count 3 were dismissed during the trial. (*Id.* at 67.) On November 22, 2010, the jury found Petitioner guilty of the eleven remaining counts with which he was charged and found true all of the remaining special allegations included in counts one, two, three, five, and six. (*Id.* at 73–83.) Petitioner was sentenced to 16 years plus 130 years to life in state prison. (*Id.* at 5.) Petitioner is currently in custody at the Mule Creek State Prison in Ione, California.[3]

---

[3]   At the time the Petition was filed, Petitioner was in custody at the Richard J. Donovan Correctional Facility in San Diego, California, where Respondent Daniel Paramo serves as Warden. Although Petitioner is no longer in custody in the Southern District of California, this Court may continue

5

Petitioner appealed his convictions to the California Court of Appeal in case number D059874.  (ECF No. 7-9.)  In his appeal, Petitioner claimed his convictions should be reversed because "he was denied his fundamental right to a fair trial due to a combination of prosecutorial misconduct and the admission of other irrelevant and highly prejudicial evidence."[4]  (*Id.* at 22.)  The Court of Appeal affirmed Petitioner's convictions in a reasoned decision on February 14, 2013.  (ECF No. 7-11.)

Petitioner then appealed his convictions to the California Supreme Court in case number S209519.  (ECF No. 7-13.)  Petitioner again made the argument that his convictions should be reversed because he was denied his fundamental right to a fair trial due to a combination of prosecutorial misconduct and the admission of irrelevant and highly prejudicial evidence.  (*See id.*)  On May 24, 2013, the California Supreme Court summarily denied Petitioner's petition for review.  (ECF No. 7-12.)

On March 28, 2014, Petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court (the "Petition").  (ECF No. 1.)  Petitioner subsequently filed two motions for appointment of counsel (ECF Nos. 9 & 15), which this Court denied (ECF Nos. 10 & 16).  Respondent filed his Answer to the Petition on June 27, 2014 (ECF No. 6), and Petitioner filed a Traverse on September 9, 2014 (ECF No. 12).

///

///

///

---

to entertain the Petition, as the state court that convicted and sentenced Petitioner is located within this Court's District.  *See* 28 U.S.C. § 2241(d).

[4]  Petitioner also asserted in his opening appellate brief to the California Court of Appeal that his convictions under counts seven through twelve should be reversed "due to insufficiency of the evidence because L. had already turned 10 years old at the time all of those offenses were committed, and under the rule of lenity, Penal Code section 288.7 does not apply to any crimes committed after the victim's 10th birthday."  (ECF No. 7-9 at 46.)  However, after Petitioner filed his opening brief, the California Supreme Court issued its decision in *People v. Cornett*, 53 Cal.4th 1261 (2012), resolving the rule of lenity issue adversely to Petitioner, and Petitioner acknowledged in his reply appellate brief to the California Court of Appeal that *Cornett* was fatal to his lenity claim.  (*See* ECF No. 7-11 at 2 n.2.)

## IV. SCOPE OF REVIEW

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") govern federal habeas corpus petitions. *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997). Under AEDPA, a federal habeas corpus petition will not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless that adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *See Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).

Under § 2254(d)(1), a federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "[A] federal

habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

For purposes of federal habeas corpus review under § 2254(d), clearly established federal law means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision" and refers to the holdings, as opposed to the dicta, of Supreme Court decisions. *Andrade*, 538 U.S. at 71–72.

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 804–06 (1991).  In the event a state court defendant raises a federal claim on direct appeal and the dispositive state court opinion rules against the defendant but does not expressly acknowledge it is deciding a federal issue, and thereafter the defendant raises the same federal claim in a federal habeas proceeding, there arises a rebuttable presumption that the federal claim was adjudicated on the merits by the state court. *Johnson v. Williams*, 133 S.Ct. 1088, 1091 (2013).  The presumption may be rebutted by the habeas petitioner—for the purpose of showing the federal court should consider the claim *de novo*—or by the state—for the purpose of showing the claim should be regarded as procedurally defaulted—but where the presumption is not rebutted, AEDPA standards apply.  *See id.*

If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000), *overruled on other grounds by Andrade*, 538 U.S. at 75–76; *Himes v. Thompson*, 336 F.3d 848, 853

8

(9th Cir. 2003).   However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim.   *See Early*, 537 U.S. at 8.   "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state court decision will not be "contrary to" clearly established federal law.   *Id.*

# V.  DISCUSSION

In his Petition, Petitioner asserts that three instances of prosecutorial misconduct and two admissions of highly prejudicial evidence during his state court trial individually and cumulatively resulted in the denial of his constitutional right to a fair trial.   (ECF No. 1 at 3–8.)   By way of relief, Petitioner seeks the reversal of his convictions, his release from Respondent's custody, and an evidentiary hearing on his claims.   (*Id.* at 9.)   Petitioner's claims are addressed in turn below.

**A.   Prosecutorial Misconduct**

Petitioner claims three instances of prosecutorial misconduct that occurred during his state court trial resulted in the denial of his fundamental right to a fair trial.   (ECF No. 1 at 3–5.)   These instances included the prosecution's presenting to the jury: (1) a "booking photograph" of Petitioner upon which certain words and phrases were superimposed; (2) two scenes from a pornographic video that were irrelevant to Petitioner's trial; and (3) witness testimony that Petitioner was affiliated with a gang.   For the reasons set forth below, the Court recommends Petitioner's prosecutorial misconduct claims be **DENIED**.

1.   <u>Legal Standard</u>

The appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power."   *Jones v. Ryan*, 691 F.3d 1093, 1102 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 2831 (2013) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).   To prevail on a claim of prosecutorial misconduct, a petitioner must show not only that the prosecutor's conduct was improper but also that the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."   *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).   "[I]t is not enough that the prosecutors' remarks

9

were undesirable or even universally condemned." *Darden*, 477 U.S. at 181 (internal citation omitted); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").

A claim of prosecutorial misconduct is evaluated not as an isolated event but in the context of the trial as a whole. *See Donnelly*, 416 U.S. at 643. When assessing a claim of prosecutorial misconduct, federal courts have considered the following factors: (1) whether a curative jury instruction was given, *see Greer v. Miller*, 483 U.S. 756, 766 & n.8 (1987); (2) the weight of the evidence against the Petitioner, *see United States v. Young*, 470 U.S. 1, 19 (1985); (3) whether the misconduct was isolated or part of an ongoing pattern, *see United States v. Kennedy*, 714 F.2d 968, 976 (9th Cir. 1983), *cert. denied*, 465 U.S. 1034 (1984); *United States v. Armstrong*, 654 F.2d 1328, 1336 (9th Cir. 1981), *cert. denied*, 454 U.S. 1157 (1982); (4) whether the misconduct related to a critical aspect of the case, *see Giglio v. United States*, 405 U.S. 150, 154–55 (1972); and (5) whether the misconduct misstated or manipulated the evidence, *see Darden*, 477 U.S. at 181–82.

## 2.   Superimposed Booking Photograph

The first of Petitioner's prosecutorial misconduct claims involves the superimposition of certain words and phrases over Petitioner's "booking photograph" during the prosecutor's opening statement.  (ECF No. 1 at 3–4.)  In its opinion on Petitioner's direct appeal, the California Court of Appeal outlined the background of the prosecutor's actions as follows:[5]

> During the prosecutor's opening statement, the prosecution made a PowerPoint presentation.  One of the slides used in the presentation was a photograph of Ivey, which the court described as a "booking photo," and that "booking photos" are "rarely flattering, but this one . . . looked unusually

---

[5] As discussed above, this Court gives deference to state court findings of fact and presumes them to be correct.  *See* 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35–36 (1992) (holding inferences properly drawn from state court findings of fact are entitled to statutory presumption of correctness).

malevolent," on which various words faded in and out by superimposition, including "betrayal," "secrecy," "deviant," and "courage of one little girl to tell."  During the prosecutor's opening statement, there was apparently no objection by the defense to this slide.  However, several days later, when the defense subsequently moved for a mistrial based on the showing of the video clip (see Analysis, *post*), the parties also discussed the offending slide from the PowerPoint presentation, with the defense arguing it was relevant when examining the prejudicial impact of the video.  The court ruled it would consider amending CALCRIM No. 222, which instructs the jury that opening statements are not evidence, to reinforce that PowerPoint presentations during opening statements are not evidence.  The court ultimately instructed the jury that opening statements, including PowerPoint presentations during opening statements, are not evidence.  During the hearing on the motion for new trial, the court stated that use of the slide in conjunction with the word "deviant" was misconduct, but it was harmless considering all the evidence.

(ECF No. 7-11 at 9.)

In the Petition, Ivey asserts the prosecutor's conduct resulted in the denial of his right to a fair trial because "the use of the photo, and the power point superimposed words, were intentional [and] intended to inflame the passions of the jury with extreme prejudice against the petitioner from the onset of the trial, and, to hide the fact from a reviewing court." (ECF No. 1 at 3–4.)  In his Answer, Respondent argues the challenged conduct did not render the trial fundamentally unfair and therefore the state court's rejection of Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established U.S. Supreme Court precedent.  (ECF No. 6-1 at 21.)

Petitioner raised this claim in his appeal to the California Supreme Court and it was denied without comment.  (ECF No. 7-12.)  Therefore, this Court "looks through" to the last reasoned state court decision to address this claim.  *See Ylst*, 501 U.S. at 805–06.  The California Court of Appeal rejected Petitioner's claim, reasoning

Here, the prosecutor had grounds to expect admissible evidence would show at a minimum that, over a several-year period, Ivey forced a young child to have vaginal and anal intercourse, forced her orally to copulate him, penetrated her with a dildo, committed other sexual acts on her, and showed her adult videos.  We conclude that, because the epithet "deviant" was not an

1
2
unwarranted characterization of Ivey's actions, there was no misconduct in the PowerPoint presentation and therefore it does not enter the calculus of whether Ivey was denied a fair trial.

3

4
(ECF No. 7-11 at 21.)

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
This Court finds the Petition fails to demonstrate Petitioner is entitled to federal habeas relief on his claim.  The U.S. Supreme Court has held that a prosecutor's unfavorable remarks about a defendant do not amount to a due process violation when the prosecutor's statements do not misstate or manipulate the evidence presented, the weight of the evidence against the defendant is great, and a curative jury instruction is provided. *See Darden*, 477 U.S. at 182–83 (finding no federal due process violation when defendant called "an animal" during prosecutor's closing argument); *see also Comer v. Schriro*, 463 F.3d 934, 960 (9th Cir. 2007) (finding no federal due process violation when defendant referred to as "a monster," "filth," and "a reincarnation of the devil" during prosecutor's closing argument); *United States v. Rude*, 88 F.3d 1538, 1547–48 (9th Cir.1996) (finding no federal due process violation when prosecutor referred to defendants through the use of terms such as "deceit," "con," "crooks," "evil," "con man," "charlatans," and "trolling around for victims" during opening statement); *accord Kellogg v. Skon*, 176 F.3d 447, 451–52 (8th Cir. 1999) (finding no federal due process violation when defendant referred to as a "monster," "sexual deviant," and "liar" during prosecutor's closing argument).

20
21
22
23
24
25
26
27
28
The present case falls squarely within the U.S. Supreme Court's holding in *Darden*. First, like in *Darden*, the prosecutor's characterization of Petitioner as a "deviant" who engaged in acts of "secrecy" and "betrayal" neither misstated nor manipulated the evidence presented at trial.  The jury heard testimony from L. about the many ways Petitioner sexually abused her on multiple occasions and about how Petitioner threatened to kill her if she told anyone about the abuse (*see* ECF No. 7-11 at 2–4), and from the pediatrician who conducted L.'s forensic examination about how the physical trauma L. suffered was the most severe trauma she had observed in a child sexual abuse victim (*see id.* at 6).  In addition, the jury was presented with other damning evidence against Petitioner including

that Petitioner was involved in a prior forcible rape and a prior domestic violence incident, that Petitioner possessed and threatened to use a firearm during the prior domestic violence incident, and that numerous sex toys and pornographic videos were found at Petitioner's residence after Petitioner's sexual abuse of L. was reported to the authorities. (*See id.* at 5–7.) In light of this evidence, the prosecutor's characterization of Petitioner, although unfavorable, was not inaccurate.

Second, like in *Darden* and as stated above, the evidence against Petitioner at trial was substantial. Given the weight of the evidence presented, there is little doubt Petitioner would have been convicted of the crimes with which he was charged had the prosecutor never presented the superimposed booking photograph to the jury.

Third, like in *Darden*, the trial court provided a curative instruction to the jury. The court specifically instructed the jury that the prosecutor's PowerPoint presentation displayed during her opening statement was not evidence and that nothing contained in the PowerPoint presentation could be considered by the jury as evidence of Petitioner's guilt. (ECF No. 7-8 at 50.)

For the foregoing reasons, Petitioner has not demonstrated that the Court of Appeal's rejection of Petitioner's first claim of prosecutorial misconduct was contrary to or an unreasonable application of clearly established federal law. Accordingly, the Court recommends this claim be **DENIED**.

    3.   <u>Pornographic Video Excerpt</u>

The second of Petitioner's three claims of prosecutorial misconduct involves the presentation of two scenes in an approximately one-minute clip of a pornographic video seized from Petitioner's home. (ECF No. 1 at 4–5.) In its opinion on Petitioner's direct appeal, the California Court of Appeal outlined the prosecutor's actions as follows:

> The prosecution presented an approximately one-minute video, composed of excerpts from the video entitled "18 'n Nasty," seized when police search[ed] Ivey's house. The defense raised no contemporaneous objection during the playing of the video excerpt. However, the following day, defense counsel moved for a mistrial (the first mistrial motion) based on

the video excerpts.  The precise background leading to the video excerpts, and basis for the objection and mistrial motion, is germane.

Prior to trial, the prosecution moved in limine to admit a brief clip from the video entitled "18 'n Nasty."  The prosecutor argued the video excerpt was relevant because it corroborated L.'s testimony that Ivey had forced her to watch approximately three minutes of a video that portrayed a dad having sex with his 15-year-old daughter.  The court agreed that a clip "consistent with what L. described is highly relevant, . . . but we need to figure out how [to admit it.]  Obviously we're not going to have [L.] shown the whole video and say, 'Do you recognize any of this?'  That's not what the law is about."  The defense argued that, to the extent any part was to be admitted, it should be without sound because L.'s testimony would be that she did not hear the audio but only viewed the video.  Thus, to the extent it was being offered for corroboration, "it should be just what L. actually observed, because she didn't hear anything."  The court ruled that a video excerpt (without any audio) would be admissible and could be played for the jury, but "I would not allow showing this to the child and say 'Is this what your saw?'  I don't think due process or the Sixth Amendment requires the infliction of that kind of further injury on a child."

The prosecution introduced the video excerpt at trial without contemporaneous objection.  However, at the end of the day, the court stated the video excerpt had depicted two sex acts that L.'s testimony had not specifically described as being on the video shown to her by Ivey, and the court wanted to set aside time to discuss "the theory of admissibility with respect to that."  The following day, the prosecutor raised the issue of the video excerpt.  The prosecutor noted the video excerpt, in addition to being relevant to corroborate L.'s testimony, was also admissible to prove one of the charges against Ivey (e.g., displaying lewd material to a minor under § 288.2), which necessitated showing the jury the content of the video.  The prosecutor explained she had asked a detective to prepare a clip with random samplings from the video, but the court explained the video excerpt showed two sex acts (involving analingus and aggressive forced oral copulation) not mentioned by L. when she described what the video had depicted, and asked "[h]ow is that relevant to anything?"  The prosecutor, responding to the court's observation L. had not described either act when discussing the video, said L.'s testimony and prior statements did refer to "having S-E-X" and "doing nasty things," and went on to explain the prosecutor "didn't go and show her the video, and did not ask her 'Let's talk about act and act and act.'"  After the prosecutor acknowledged L. did not specifically state she saw scenes

of analingus or oral copulation, the court (although acknowledging L. had indicated the video showed the man and girl engaged in "S-E-X" and "doing nasty things") observed the video excerpt contained "rather jarring" scenes and asked how the court's ruling allowing a video excerpt for corroborative purposes could "morph into a depiction of [scenes of analingus and aggressive forced oral copulation]." Defense counsel commented he understood the video excerpt would be limited to showing the ages of the man and girl, but did not think "anything depicting sex" would be shown. The defense argued the material was so shocking that it could not be cured and therefore asked for a mistrial. The court stated that, although it expected its ruling would have allowed a scene depicting sexual intercourse, it "did not envision" its ruling allowing a video excerpt would have included the clips showing the other sex acts, and that it would hold in abeyance the defense's mistrial motion to consider whether the offending parts of the video excerpt were erroneously shown to the jury and, if so, whether an effective remedy could be fashioned to cure the harm.

Following the afternoon recess, the court fully examined the issues raised by Ivey's motion for mistrial. The defense asserted the jury might have been left with the impression that "what they saw in the video is what [Ivey] did to L.," and the acts depicted were "so vile and so overwhelming that it's going to be hard for them to get past it." The defense noted that, although its interpretation of the trial court's in limine ruling would have barred any sexual acts, "as the court pointed out, perhaps we could have expected intercourse, but that's it." The defense argued the video excerpt, considered in the milieu of the evidence of other offenses by Ivey and the prosecution's use of the "deviant" characterization in its PowerPoint opening statement, had caused irreparable damage to Ivey's ability to obtain a fair trial and mistrial was necessary. The prosecutor argued that she took responsibility for any error, and acknowledged she should have prescreened the video excerpt for the court and defense counsel but "I didn't [and] [f]or that we're having this argument." In mitigation, the prosecutor noted that L.'s testimony—that she saw "S-E-X" on the video—was a broad term that could encompass any different acts, and also noted L. had told the interviewer from the Chadwick Center she had seen "his private parts, and it going by so fast, and I just saw the dad doing what [Ivey] did to me."

The court concluded that, although two of the segments of the video (one of which involved intercourse between the man and the young girl) were admissible, the scenes of analingus and oral copulation were inadmissible and would have been excluded had the court been presented the opportunity to

15

rule on the tape in advance.  However, the court decided that, before declaring a mistrial, it would ask the jurors whether they believed they could follow an instruction to ignore the inadmissible scenes and, if the court was satisfied with the jury's answer that it could ignore the two scenes, it would deny the mistrial.

The court then addressed the jury as follows:

"Ladies and gentlemen, you have heard testimony that a video recording . . . was recovered from [Ivey's] home that was consistent with the video that L. states was shown to her by [Ivey] . . . .

"The Court—that's I—allowed a clip taken from that video to be shown to you as evidence.  The weight of that evidence, of course, is for you to decide.

"Now, the video clip that was shown to you contained some scenes that L. did not describe. . . .

"I refer to the scene in which the adult male, who is the supposed dad in this video, is seen licking the anus of the supposed young girl.  The second scene is the one in which the adult male was forcibly inserting or jamming his erect penis into the girl's mouth.

"Now, there's no evidence before this Court that the video that was shown to L. showed either of those two scenes.  Frankly, those two scenes should not have been shown to you.

"I am going to order and hereby order that those two scenes be stricken from the evidence.  This means that you must not consider those scenes for any purpose in your deliberations.  You must evaluate the evidence and do your other duty as jurors as though you had never seen those scenes.  In particular, you must not draw any negative conclusions about [Ivey's] character from the fact that he was in possession at some point of a video that showed that kind of conduct.

"Does everybody understand this instruction?  Can everybody follow this instruction if it's given to you?  I'm seeing all affirmative responses to the first question."

After clarifying that the jury was to disregard only those two scenes, the court continued:

"Now, I'm going to speak candidly to you.  We have this saying 'How can you un-ring a bell?'  And my question is—I'm going to ask each one of you individually to ask yourself 'Can I disregard that or did I find it so shocking or so'—if not shocking—'impactful that I'm somehow going to be considering it when I view the evidence or judge the credibility or apply the burden of proof or do all the things that I'm required to do as a juror?'

"Does anybody think that you will not be able to disregard those scenes?  Does anybody think you won't be able to put it out of your mind?  If so, please raise your hands."

The only juror to express concern, Juror No. 9, responded that "it might be difficult to be able to separate the whole thing . . . .  It's like just those two scenes from the whole clip, it would be somewhat difficult, in my opinion, to be able to not use those.  But honestly I thought that video really didn't say much[,] actually."  The court then questioned Juror No. 9 in detail, asking whether viewing those scenes would make him more biased against Ivey than if the scenes had not been shown, or would make it difficult to judge the rest of the evidence just because the juror had viewed those scenes, or whether it would affect the juror's ability to apply the law as instructed by the court.  Juror No. 9 answered "no" to each query.  The court then asked each juror and both alternates, individually, whether they could follow the instruction to disregard the scenes, and all of them affirmed they could follow the instruction.  On the basis of those answers, and after the jury was excused for a recess, the court denied the motion for mistrial.

Two days later, the defense renewed the motion for mistrial.  The defense argued the video clip it had received, on a DVD apparently given to the defense before the start of trial, was a clip that contained no sexual acts.  The court noted that the clip the defense was describing was "the way it was presented in the PowerPoint in the opening statement."  The defense argued that, because it never received the clip ultimately shown to the jury containing

the offending scenes, the defense had been misled.  The prosecutor recalled she had given a copy of the offending clip to the defense on the first day of trial but had no receipt.

The court asked "[a]ssuming that you were to use the word that you used, 'misled,' how does that change the mistrial analysis?"  After the defense indicated it was "akin to . . . a discovery violation," the court observed that the mistrial analysis remained unchanged, and the issue remained whether there was prejudice to Ivey's right to a fair trial from the two excluded scenes.  The court observed it remained satisfied Ivey's right to a fair trial had not been infringed, and therefore denied the motion for mistrial.

(ECF No. 7-11 at 10–15.)

In the Petition, Ivey asserts he was denied his fundamental right to a fair trial because the prosecution's conduct was "extremely prejudicial."  (ECF No. 1 at 5.)  In his Answer, Respondent argues the challenged conduct did not render the trial fundamentally unfair and therefore the state court's rejection of Petitioner's claim was neither contrary to nor an unreasonable application of clearly established U.S. Supreme Court precedent.  (ECF No. 6-1 at 21.)

On direct appeal, the California Supreme Court denied Petitioner's claim without comment.  (ECF No. 7-12.)  Therefore, this Court "looks through" to the last reasoned state court decision to address this claim.  *See Ylst*, 501 U.S. at 805–06.  The California Court of Appeal rejected Petitioner's claim on the following grounds: (1) "the prosecutor's improper editorial decision did not amount to an egregious pattern of conduct rendering the trial fundamentally unfair, but instead constituted an isolated instance in a lengthy and otherwise well-conducted trial"; and (2) "the court's extensive and meticulous handling of the evidence cured any harm from the error."  (ECF No. 7-11 at 23–24 (internal citations omitted).)

The Court finds the Petition fails to demonstrate Petitioner is entitled to federal habeas relief on his claim.  Federal courts are reluctant to reverse state court criminal convictions where a prosecutor's misconduct was a single, isolated action that did not stress any reference to guilt and that was followed by a curative jury instruction.  *See Kennedy*,

714 F.2d at 976; *Armstrong*, 654 F.2d at 1336.  In the present case, the prosecutor's presentation of the two pornographic scenes to the jury—although improper—was a single, isolated, momentary event within a lengthy trial where the amount of other evidence against Petitioner was significant.  In addition, the record below reflects the prosecutor did not stress Petitioner's guilt when presenting the two pornographic scenes to the jury any more than she did when presenting other evidence against Petitioner.  (*See* ECF No. 7-5 at 12–15.)  Moreover, after the presentation of the two scenes to the jury, the trial court struck the scenes from the evidence and provided the jury with a detailed and thorough curative instruction.  Not only did the trial court instruct the jurors to refrain from considering the scenes "for any purpose in [their] deliberations," it also conferred with each and every member of the jury on a one-on-one basis to ensure the entire panel both understood and would be able to comply with the court's curative instruction.  (*See* ECF No. 7-6 at 120–25.)  When one juror expressed concern about his ability to comply with the instruction, the court questioned him extensively about his ability to judge the rest of the evidence and apply the law as instructed.  (*See id.* at 122–23.)  The juror answered "no" to each of the court's questions.  (*See id.*)

For the foregoing reasons, the Petition fails to demonstrate the California Court of Appeal's rejection of Petitioner's second claim of prosecutorial misconduct was contrary to or an unreasonable application of clearly established federal law.  Accordingly, the Court recommends this claim be **DENIED**.

4.   Gang Reference

Petitioner's final prosecutorial misconduct claim involves the presentation of evidence of Petitioner's alleged gang affiliation.  (ECF No. 1 at 5–6.)  In its opinion on Petitioner's direct appeal, the California Court of Appeal outlined the prosecutor's actions as follows:

> During trial, the parties litigated whether the jury would be permitted to hear (1) that Ivey was found in possession of a loaded firearm when police responded to the November 2005 domestic violence incident involving Ivey and Davis, and (2) Ivey claimed gang affiliation.  The prosecutor argued the

gun was probative of why L. and Davis would have feared Ivey and therefore not have reported Ivey's sexual abuse in a timely manner. The court ruled under Evidence Code section 352 that the gun possession was more probative than prejudicial and permitted that evidence. As to the gang membership, the prosecutor noted A.B. had been reluctant initially to report the rape to police because she was afraid Ivey and his cohort were gang members and there would be repercussions if she contacted police. However, the prosecutor agreed that, as long as the defense did not seek to suggest that her initial reluctance to contact police was because the rape did not occur, there would be no need to elicit Ivey's alleged gang membership. The court ruled neither A.B. nor Davis could refer to Ivey's alleged gang membership but the court would reconsider that ruling if the "door has been opened or a false picture has been painted" by the defense's cross-examination.

During trial, the defense cross-examined officer Czas, the officer who responded to the 2005 domestic violence incident and found the gun, in an apparent effort to show Ivey had never threatened to employ the gun against Davis. The question and answer sequence that elicited the gang reference was as follows:

> "[Defense Counsel]: And . . . after you found [the gun], did you . . . show it to [Davis]?

> "[Officer Czas]: Yes.

> "[Defense Counsel]: And other than telling you where she believed the gun would be located, did she make any other remarks about the gun?

> "[Officer Czas]: At that time?

> "[Defense Counsel]: Yes.

> "[Officer Czas]: Yes. She told me that [Ivey] possessed a gun for approximately two years, that he used it for protection. He kept it mostly in the house, but sometimes he took it out concealed on his person because he was a Skyline gang member.

> "[The Prosecutor]: Objection, your Honor . . . ."

20

14-cv-715 MMA (JLB)

Shortly thereafter, the jury was excused for a recess and the court asked "do we need to do anything with respect to Officer Czas starting to mention something about gang membership?"  Defense counsel complained that, although he had asked Officer Czas a "yes" or "no" question, Officer Czas chose to "give out as much information in as short a period of time as he possibly could, including prejudicial information regarding alleged gang affiliation," and argued "I don't necessarily think it was an accident."  Defense counsel asked whether Officer Czas had been admonished by the prosecutor not to mention the gang evidence, and the prosecutor (after noting her surprise that defense counsel allowed the officer to give a narrative answer without interrupting him) stated she did not remind the officer of the ruling because the prosecutor thought "this was a nonissue" because "this wasn't one of the witnesses that I was concerned about and raised in limine that the Skyline issue would come up at all.  I thought it was going to come up with [Davis] and with A. because they're the ones that made statements to the officers. . . . Hinds and Czas I didn't expect at all . . . because they are hearsay recipients of [Davis] and A. who said the word 'Skyline.'  I admonished A. and [Davis] but I never even raised that with Czas and Hinds . . . because . . . it would be a hearsay statement period.  So we had the real declarants in court, and those are the ones I was really concerned about."

The court asked defense counsel, "What do you want?" and defense counsel indicated there should be "some sort of an instruction to the jury to ignore that."  The court ruled Officer Czas did not deliberately attempt to subvert the court's order nor act in bad faith, and outlined a proposed curative instruction striking the evidence and ordering the jury to disregard the evidence.  However, it appears the instruction was never given.

(ECF No. 7-11 at 16–18.)

In the Petition, Ivey asserts the "prior act of volunteered testimony against court rule, compounded by prosecutorial misconduct in regard to admonish[ing] the witness of the prior court ruling, and the presentation of enlarged photos of the gun"[6] resulted in the denial

---

6   The Petition asserts that during the trial, the prosecutor presented the jury with enlarged photographs of "the same alleged gang connected gun" discussed during Officer Czas' cross-examination.  (ECF No. 1 at 6.)  Petitioner does not assert a claim that the admission of the evidence of the gun was in error or that the prosecutor's use of what Petitioner characterizes as "enlarged photos of the gun" amounted to prosecutorial misconduct.  Instead, Petitioner mentions the "enlarged photos" as part of the context in

21

of Petitioner's right to a fair trial.  (ECF No. 1 at 6.)  In his Answer, Respondent argues, "to the extent the state court rejected the claim regarding the gang reference as forfeited, that portion of Ivey's claim is procedurally barred.  The Ninth Circuit has found this state procedural rule to be an adequate and independent bar to federal habeas review."  (ECF No. 6-1 at 20–21 (citing *Paulino v. Castro*, 371 F.3d 1083, 1093 (9th Cir. 2004); *Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002); *Vansickel v. White*, 166 F.3d 953, 957–58 (9th Cir. 1999)).)

On direct appeal, the California Supreme Court denied Petitioner's claim without comment.  (ECF No. 7-12.)  Therefore, this Court "looks through" to the last reasoned state court decision to address this claim.  *See Ylst*, 501 U.S. at 805–06.  The California Court of Appeal rejected Petitioner's claim that the allusion to Ivey belonging to the Skyline gang "was neither misconduct nor was it preserved for appeal."  With respect to the forfeiture of the claim, the court stated,

> [B]ecause a claim of misconduct is forfeited on appeal if the defendant does not pursue a curative admonition (*People v. Montiel*, *supra*, 5 Cal.4th at p. 914; *People v. Silva*, *supra*, 25 Cal.4th at p. 373), we conclude the claim here must be deemed forfeited.  Although Ivey's counsel did state a curative admonition would be appropriate, the record is devoid of any suggestion the defense made any effort to pursue that instruction thereafter.  "If the point is not pressed and is forgotten, [a defendant] may be deemed to have waived or abandoned it, just as if he had failed to make the objection in the first place." (*People v. Obie* (1974) 41 Cal.App.3d 744, 750, disapproved on other grounds by *People v. Rollo* (1977) 20 Cal.3d 109, 120 fn.4; accord, *People v. Braxton* (2004) 34 Cal.4th 798, 813–814; *People v. Brewer* (2000) 81 Cal.App.4th 442, 459–462.)

(ECF No. 7-11 at 22.)

---

which the assertedly improper gang evidence was received, bolstering Petitioner's argument regarding the prejudicial effect of the gang evidence.  (*See id*.)

### i.     Procedural Bar

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *see also Herb v. Pitcairn*, 324 U.S. 117, 125–26 (1945) ("[The U.S. Supreme Court is] not permitted to render an advisory opinion, and if the same judgment would be rendered by the state court after we corrected its views of federal laws, our review could amount to nothing more than an advisory opinion.")  "This rule applies whether the state law ground is substantive or procedural." *Coleman*, 501 U.S. at 729.

Although a state procedural rule is sufficient to foreclose federal habeas review, a federal court must inquire into the adequacy of a state rule to foreclose review. *Melendez v. Pliler*, 288 F.3d 1120, 1124 (9th Cir. 2002) (citing *Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).  A state procedural rule adequately bars federal habeas review only if it is "clear, consistently applied, and well-established at the time of the petitioner's purported default." *Id.* (quoting *Calderon v. U.S. Dist. Court*, 96 F.3d 1126, 1129 (9th Cir. 1996), *cert. denied*, 520 U.S. 1204 (1997)).  The adequacy of a state procedural bar is not to be presumed, and the burden of proving adequacy lies on the respondent, as a procedural default is an affirmative defense. *Bennett v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003).  Furthermore, in the context of federal habeas corpus, "[i]t is the state, not the petitioner, often appearing *pro se*, who has at its hands the records and authorities to prove whether its courts have regularly and consistently applied the procedural bar." *Id.*

Here, the Court finds Respondent did not meet his burden of proving the state procedural rule on which the California Court of Appeal relied in dismissing Petitioner's claim adequately bars federal habeas review.  The cases Respondent cites to in his Answer—*Paulino v. Castro*, 371 F.3d 1083, 1093 (9th Cir. 2004), *Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002), and *Vansickel v. White*, 166 F.3d 953, 957–58 (9th Cir. 1999)—held that California's "contemporaneous objection rule"—which permits the admission of evidence unless there is an objection, the grounds for the objection are clearly

23

expressed, and the objection is made at the time the evidence is introduced—is a state procedural rule that adequately forecloses federal habeas review.  However, the California Court of Appeal did not reject Petitioner's claim on the basis his counsel failed to timely object to the gang-related evidence; the court rejected Petitioner's claim on the basis his counsel failed to pursue the curative instruction he sought shortly after Officer Czas' cross-examination.  (*See* ECF No. 7-11 at 22.)  Respondent's Answer is silent with respect to the adequacy of this state procedural rule to bar federal habeas review.  Thus, Respondent failed to demonstrate that the state procedural rule applied by the California Court of Appeal is adequate to foreclose federal habeas review of Petitioner's third claim of prosecutorial misconduct, and the merits of Petitioner's claim must be addressed here.

### ii.    *Merits of Petitioner's Federal Habeas Claim*

Upon a thorough review of Petitioner's third claim of prosecutorial misconduct, the Court finds the Petition fails to demonstrate federal habeas corpus relief is warranted.  To prevail on his claim of prosecutorial misconduct, Petitioner needed to show first that there was misconduct and second that the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly*, 416 U.S. at 643.  Here, Petitioner's claim fails both prongs of this test, as the prosecutor's conduct regarding the presentation of evidence regarding Petitioner's alleged gang affiliation was neither improper nor prejudicial.

With respect to Officer Czas' testimony, the reference to Petitioner's alleged gang affiliation was introduced during a cross-examination conducted by Petitioner's own counsel, not the prosecutor, and it was the prosecutor who immediately objected to the witness's statement regarding the alleged gang affiliation.  (*See* ECF No. 7-11 at 16–18.)  In addition, although Petitioner asserts otherwise, the prosecutor was under no obligation to admonish Officer Czas about referencing Petitioner's alleged gang affiliation during his testimony.  The trial court's order with respect to this issue specifically required the prosecutor to instruct A.B. and Davis, only, that they were not to reference Petitioner's gang affiliation.  (*See* ECF No. 7-5 at 56–57 ("Here's my ruling: It has some probative

value, but it is very prejudicial.  I'm going to exclude reference to the gang membership from either Ms. [B] or Tisha unless I think the door has been so opened that it becomes relevant and necessary to complete the picture.").)  The ruling did not direct the prosecutor to ensure that Officer Czas, or any other witness who was not A.B. or Davis for that matter, refrain from referencing Petitioner's gang membership.  Furthermore, it was not unreasonable for the prosecutor to fail to warn Officer Czas not to testify about Petitioner's gang affiliation, as Officer Czas was a hearsay recipient of A.B.'s and Davis's statements regarding Petitioner's alleged gang affiliation, and with A.B. and Davis available to testify on their own at trial, the prosecutor reasonably anticipated Officer Czas would not be called upon to address this issue.  (*See* ECF No. 7-11 at 17–18.)

In the absence of a finding of prosecutorial misconduct, the Court need not address the issue of whether the prosecutor's actions were prejudicial.  However, assuming *arguendo* that the prosecutor's conduct with respect to Officer Czas' testimony was improper, when viewed in the context of the trial as a whole, it did not infect the trial with unfairness.  The weight of evidence against Petitioner was great, and there is little doubt Petitioner would have been convicted even if Officer Czas had not referenced Petitioner's alleged gang affiliation.

For the foregoing reasons, Petitioner has not shown that the California Court of Appeal's rejection of his third claim of prosecutorial misconduct was contrary to or an unreasonable application of clearly established federal law.  Accordingly, the Court recommends this claim be **DENIED**.

**B.    Admission of Other Offenses Evidence**

Petitioner claims the California Court of Appeal abused its discretion in finding the trial court's admission of evidence relating to two prior offenses Petitioner committed, a prior forcible rape and a prior domestic violence incident, did not result in the denial of Petitioner's constitutional right to a fair trial.  (ECF No. 1 at 6–7.)  For the reasons set forth below, the Court recommends Petitioner's claims be **DENIED**.

1.   <u>Prior Forcible Rape</u>

During Petitioner's state court trial, the court allowed the prosecution to present evidence related to a prior forcible rape committed by Petitioner.  The court found the evidence admissible on the basis it was relevant to and probative of Petitioner's propensity to sexually assault vulnerable younger victims.  (*See* ECF No. 7-3 at 53–55.)  In its opinion on Petitioner's direct appeal, the California Court of Appeal set forth the following factual summary with respect to the prior forcible rape and the related evidence presented at Petitioner's state court trial:

> . . . .  In March 1999 Ivey raped A.B., then 17 years old.  She and a friend (P.) worked at a commissary.  Ivey, along with his friend Phillip and another man, picked the girls up and took them to an abandoned house, owned by Ivey's mother, so they could "hang out."  The group consumed alcohol and all but A. consumed marijuana.  At some point, Ivey and P. went into a bedroom together, and A. decided she wanted to leave.  A. used the bathroom and, as she was walking out, Phillip entered and started kissing her.  Phillip carried her to a bedroom, put on a condom, and began having intercourse with her.  She testified she "didn't want to do that," adding she had "never done anything like that before."  When the prosecutor asked her to clarify that remark, she said "I never had sex or anything.  I was a virgin."  However, Phillip started having sex with her and, upon finishing, Phillip left the room.  Ivey then came into the bedroom and, as A. was trying to get dressed, Ivey grabbed her and pulled off her pants.  She begged to be taken home, but Ivey ignored her, picked her up, placed her back against the wall, and started having intercourse with her.  As he did, A. said "Please, not again."  Ivey then put A. on the ground and got on top of her, and A. tried to scoot away, but Ivey kept pulling her back towards him.  Finally, after A. said "Dear God, help me," Ivey stopped and left the room, and A. was able to leave.  The jury was told Ivey had been charged with forcible rape and felony unlawful intercourse with a minor and had pleaded guilty to the latter charge.

(ECF No. 7-11 at 6–7.)

In his Petition, Petitioner alleges the trial court "abused its discretion in not finding the prejudicial aspect of such testimony outweighed the probative value of said same, and as a result, petitioner was denied his right to a fair trial."  (ECF No. 1 at 6.)  In his Answer, Respondent argues Petitioner's claim is unexhausted because "on direct appeal and in his

petition for review, Ivey expressly did not challenge the trial court's ruling on the admission of Ivey's prior conduct of rape under California Evidence Code sections 352 and 1108." (ECF No. 6-1 at 21.)  Respondent also argues Petitioner is not entitled to federal habeas relief on this claim because "[f]ederal habeas corpus is available only on behalf of a person in custody in violation of the Constitution or laws or treaties of the United States" and a "violation of state law standing alone is not cognizable in federal court on habeas." (*Id.* at 21–22.)  The Court addresses Respondent's arguments in turn below.

### i.    *Exhaustion of State Court Remedies*

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A); *see also Hiivala v. Wood*, 195 F.3d 1098, 1107 (9th Cir. 1999) ("A habeas petitioner must give the state courts the first opportunity to review any claim of federal constitutional error before seeking federal habeas review of that claim.").

To fully exhaust one's state court remedies, a petitioner must "fairly present" the "substance" of a federal habeas claim to the state courts.  *See Gray v. Netherland*, 518 U.S. 152, 162–63 (1996) (quoting *Picard v. Connor*, 404 U.S. 270, 278 (1971)).  For exhaustion purposes, the "substance" of a federal habeas claim includes "reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief."  *Id.* (citing *Picard*, 404 U.S. at 277).  "[I]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court."  *Id.* at 163 (citing *Anderson v. Harless*, 459 U.S. 4, 7 (1982)).  Furthermore, it is not enough to raise only the facts necessary to state a claim for relief; rather, "the constitutional claim . . . inherent in those facts" must be brought to the attention of the state courts so that the state courts had an opportunity to rule on the claim.  *See Picard*, 404 U.S. at 277; *see also Hiivala*, 195 F.3d at 1106 ("To 'fairly present' [a] federal claim to the state courts, [a petitioner must] alert the state courts to the fact that he [is] asserting a claim under the United States Constitution.").

The Court agrees with Respondent that Petitioner failed to exhaust his state court remedies with respect to any claim that the trial court erred in admitting the prior rape evidence under the California Evidence Code.  In his opening appellate briefs to both the California Court of Appeal and the California Supreme Court, Petitioner expressly stated that he "does not separately challenge [the trial court's] ruling as an abuse of discretion under Evidence Code sections 1108 or 352."  (ECF No. 7-9 at 36; ECF No. 7-13 at 23.)  Thus, Petitioner failed to present to the California Court of Appeal and the California Supreme Court a claim that the admission of the prior rape evidence violated California state law and thus, under AEDPA, Plaintiff may not present such a claim in his Petition filed with this Court.  *See* 28 U.S.C. § 2254(b)(1)(A).

On the other hand, the Court disagrees with Respondent and finds that Petitioner did exhaust his state court remedies with respect to a federal habeas claim regarding the trial court's admission of the prior rape evidence.  First, Petitioner referenced a specific federal constitutional guarantee in his direct appeals to the California Court of Appeal and Supreme Court—his right to a fair trial under the due process clause of the Fourteenth Amendment.  (*See, e.g.*, ECF No. 7-9 at 22; ECF No. 7-13 at 7, 30–33.)[7]

Second, Petitioner's opening appellate briefs to the state courts alerted the courts that he was raising a federal habeas claim.  Petitioner's briefs[8] stated in relevant part,

> Prior to trial, the court granted the prosecution's in limine motion pursuant to Evidence Code section 1108 to admit the evidence of the prior forcible rape and statutory rape offenses committed by appellant against A.B.  Appellant does not separately challenge that ruling as an abuse of discretion under Evidence Code sections 1108 or 352.  However, the fact that highly prejudicial evidence of a prior forcible rape, for which the defendant was not

---

[7] Although Petitioner did not cite to the U.S. Constitution or the federal due process clause in the sections of his appellate briefs that specifically address his prior forcible rape evidence claim, when Petitioner's appellate briefs are reviewed in their entirety, the requisite citations are found throughout.

[8] With respect to Petitioner's claim regarding the admission of the prior rape evidence, the statements of facts contained in Petitioner's opening appellate briefs to the California Court of Appeal and California Supreme Court are identical.  (*Compare* ECF No. 7-9 at 36–38, *with* ECF No. 7-13 at 23–25.)

previously convicted, was being admitted at trial is relevant to the overall the [sic] fair trial analysis.

. . . .

The fact that the trial court found that the prejudice of this prior forcible rape evidence did not substantially outweigh the probative value, and that this ruling was within the bounds of the court's broad discretion, means that this evidence was legally admissible.  It does not mean that there was no prejudice.

Thus, when properly viewing the record as a whole and evaluating whether appellant was denied his right to a fair trial as a result of the numerous errors that did occur in this case, appellant respectfully urges that this Court should view those errors in context and keep in mind that appellant's right to a fair trial was already being endangered by the evidence of this prior rape incident.

(ECF No. 7-9 at 36–37; ECF No. 7-13 at 23–25.)  It is this Court's understanding that by expressly stating he was not *separately* challenging the trial court's ruling under the state's evidence code but instead appealing to the "overall [] fair trial analysis" (ECF No. 7-9 at 36; ECF No. 7-13 at 23), and by raising this specific argument under the general heading that Petitioner "was denied his fundamental constitutional right to a fair trial" (ECF No. 7-9 at 22; ECF No. 7-13 at 7), Petitioner was attempting to alert the state courts that he was raising not a state-law claim but a federal due process claim.  Accordingly, the Court finds Petitioner exhausted his state court remedies with respect to his federal habeas claim relating to the admission of the prior forcible rape evidence, and review of the claim by this Court is not foreclosed.

///

///

///

///

///

*ii.      Merits of Petitioner's Federal Habeas Claim[9]*

Petitioner raised his claim that the admission of the prior rape evidence denied him his fundamental right to a fair trial in his appeal to the California Supreme Court, and the claim was denied without comment.  (ECF No. 7-12.)   Therefore, this Court "looks through" to the last reasoned state court decision to address this claim.  *See Ylst*, 501 U.S. at 805–06.  The California Court of Appeal disposed of Petitioner's claim in a single footnoted sentence, stating, "Ivey does not assert admission of the A.B. rape exceeded the boundaries of the court's discretion."  (*See* ECF No. 7-11 at 18 n.4.)   The court did not specifically address Petitioner's federal due process claim.  When a state court issues an opinion that rules against a state court defendant but does not expressly address the federal claim raised, there is a rebuttable presumption that the federal claim was adjudicated on the merits.  *See Johnson*, 133 S. Ct. at 1091.  Ivey did not rebut this presumption in his Petition, and this Court therefore reviews Petitioner's claim under the strict standards of the AEDPA.

This Court finds Petitioner's claim fails to establish that the granting of federal habeas relief is warranted.  Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the granting of federal habeas corpus relief if such admissions are not forbidden by "clearly established Federal law" as set forth by the U.S. Supreme Court.  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (citing 28 U.S.C. § 2254(d)).   The Supreme Court has made very few rulings regarding when the admission of evidence amounts to a violation of due process.

---

[9] As discussed above, Plaintiff failed to exhaust his state court remedies with respect to any claim that the trial court erred in admitting the prior rape evidence under California state law, and as a result, AEDPA prohibits this Court from addressing any such claim.  28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State.").  However, even if Plaintiff had exhausted his state court remedies with respect to such a claim, federal habeas corpus review would not be available.  *See* discussion *infra* p. 33.

*Yarborough*, 568 F.3d at 1101.  Although the Supreme Court has made clear that federal habeas relief should be granted when constitutional errors render a trial fundamentally unfair, *see Williams v. Taylor*, 529 U.S. 362, 375 (2000), it has "never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith." *Alberni v. McDaniel*, 458 F.3d 860, 863 (9th Cir. 2006) (quoting *Garceau v. Woodford*, 275 F.3d 769, 774 (9th Cir. 2001), *rev'd on other grounds*, 538 U.S. 202 (2003)).  Absent such a holding from the Supreme Court, this Court cannot conclude that the California Court of Appeal's ruling on Petitioner's claim was contrary to or an unreasonable application of clearly established federal law.  *See Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court regarding the [issue] involved here, it cannot be said that the state court 'unreasonably applied clearly established Federal law.'"); *see also Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008) (holding that the state court could not have unreasonably applied federal law if no clear Supreme Court precedent exists).

Furthermore, even if the Court could, as urged by Petitioner, reach the question of fundamental fairness, Petitioner would still not prevail.  The Petition still fails to demonstrate that federal habeas relief is warranted because the weight of the evidence against Petitioner was strong and the admission of the challenged evidence, even if erroneous, did not render Petitioner's trial fundamentally unfair.

Accordingly, under the strict standards of AEDPA, this Court cannot grant federal habeas relief on the basis of Petitioner's claim, and the Court therefore recommends the claim be **DENIED**.

2.    Prior Domestic Violence Incident

During Petitioner's state court trial, the court also allowed the prosecution to present evidence related to a prior domestic violence incidence in which Petitioner was involved. The trial court found the evidence admissible on the basis it was relevant to and probative of the reasons why L. and Davis delayed reporting Petitioner's sexual abuse of L. to authorities.  (*See* ECF No. 7-11 at 18 n.4.)  In its opinion on Petitioner's direct appeal, the

California Court of Appeal provided the following factual summary with respect to the prior domestic violence incident and the related evidence presented at trial:

> The jury also heard of a November 2005 incident involving Ivey and Davis.  During an argument, Ivey threw Davis's cell phone against a wall and broke it, and then pinned her onto the bed and began choking and hitting her while their daughter, Je., was in a playpen in the same bedroom.  While they struggled, J. called 911.  When Officer Czas responded, he saw a fully loaded magazine for a .45 caliber handgun sitting on a television in the same bedroom.  After Ivey said he did not know where the gun was, Czas asked Davis where the handgun was located.  Davis said it was under a cushion of a couch in the same bedroom.  Czas found the weapon, which also had a fully loaded clip in it, although no round was chambered in the gun.  Davis testified at trial Ivey threatened to shoot her during the fight, but conceded she had not told Czas of this threat.

(*Id.* at 7.)

In the Petition, Ivey asserts "the trier of fact abused its discretion in not finding the admission of [the] domestic incident was an abuse of discretion by the trial court which denied petitioner his right to a fair trial."  (ECF No. 1 at 7.)  In his Answer, Respondent argues that to the extent Petitioner's claim alleges a violation of state evidentiary rules, it should be denied for failure to present a federal question, and to the extent the claim alleges a federal due process violation, it is without merit.  (ECF No. 6-1 at 22.)

Petitioner raised this claim in his appeal to the California Supreme Court and it was denied without comment.  (ECF No. 7-12.)  Therefore, this Court "looks through" to the last reasoned state court decision to address this claim.  *See Ylst*, 501 U.S. at 805–06.  The California Court of Appeal stated,

> Ivey does assert admission of the domestic violence incident and the presence of the gun during that incident was an abuse of discretion under Evidence Code section 352 and contributed to the denial of a fair trial.  However, the court found the domestic violence and gun possession evidence was admissible under Evidence Code section 352 to explain why L. was reluctant to come forward: she had been placed in fear by Ivey's threats and her fear that Ivey would exact retribution was predicated in part on Ivey's willingness to employ violence.  The court also found the 2005 incident was admissible

32

to rebut the defense theory for why Davis delayed reporting the sexual abuse (e.g. because Davis disbelieved L.'s claim) by proffering an alternative explanation for why she delayed: Davis was intimidated by Ivey's willingness to use violence against her. Although Ivey asserts the evidence of his threat to kill L. if she told anyone was adequate to establish her fear of him, that evidence did not make the domestic violence irrelevant or cumulative; to the contrary, Ivey's violence and gun possession was relevant because it showed L. had reason to believe Ivey would carry out his threats. We do not conclude admission of the domestic violence and gun possession was an abuse of discretion under Evidence Code section 352.

(ECF No. 7-11 at 18 n.4.)

This Court finds that to the extent Petitioner's claim challenges the state trial court's application of state evidentiary law, such a claim is not cognizable in federal habeas corpus. The U.S. Supreme Court has repeatedly held that "federal habeas corpus relief does not lie for errors of state law" and "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)) (citing *Pulley v. Harris*, 465 U.S. 37, 41 (1984)). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68 (citing 28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 (1975) (per curiam)). "[T]he presence or absence of a state law violation is largely beside the point." *Jammal v. Van de Kamp*, 926 F.2d 918, 919–20 (9th Cir. 1991).

To the extent Petitioner's claim asserts a federal due process violation, Petitioner has failed to show that federal habeas relief is warranted. For one thing, as reasonably found by the California Court of Appeal, the evidence was relevant and was not admitted for purposes of showing conduct in conformity therewith. In addition, as noted above, the Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process, and it has not yet made a clear ruling that admission of even *irrelevant* or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of a writ. *Yarborough*, 568 F.3d at 1101; *see also Garceau*, 275 F.3d at 774 ("[T]he Supreme Court has never expressly held that it violates due process to admit

33

other crimes evidence for the purpose of showing conduct in conformity therewith, or that it violates due process to admit other crimes evidence for other purposes without an instruction limiting the jury's consideration of the evidence to such purposes."). Absent such a holding, this Court cannot conclude the California Court of Appeal's ruling was contrary to or an unreasonable application of clearly established federal law. *See Musladin*, 549 U.S. at 77 (2006).

Furthermore, as discussed above, even if the Court could, as urged by Petitioner, reach the question of fundamental fairness, Petitioner would still not prevail. The Petition still fails to demonstrate that federal habeas relief is warranted because the weight of the evidence against Petitioner was strong and the admission of the challenged evidence, even if erroneous, did not render Petitioner's trial fundamentally unfair.

Accordingly, under the strict standards of AEDPA, this Court cannot grant federal habeas relief on the basis of Petitioner's claim, and the Court therefore recommends the claim be **DENIED**.

## C.   Cumulative Impact

In addition to the individual claims discussed above, Petitioner claims "the totality of the above described trial errors prejudiced the petitioner in so much that[] petitioner was denied the right to a fair trial." (ECF No. 1 at 8.)  In his Answer, Respondent argues "[t]he state appellate court's implicit rejection of this claim was reasonable." (ECF No. 6-1 at 23–24.)

Petitioner raised this claim in his appeal to the California Supreme Court and it was denied without comment. (ECF No. 7-12.)  Therefore, this Court "looks through" to the last reasoned state court decision to address this claim. *See Ylst*, 501 U.S. at 805–06.  The California Court of Appeal implicitly rejected Petitioner's claim, reasoning, "A defendant is entitled to a fair trial, not a perfect trial . . . , and we conclude that, because the only error was adequately remedied, Ivey was not deprived of his right to a fair trial." (ECF No. 7-11 at 24.)

The Petition fails to demonstrate that federal habeas relief based on this claim is warranted.  The U.S. Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair.  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298, 302–03 (1973)).  The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal.  *Id.* (citing *Chambers*, 410 U.S. at 290 n.3).

Under the traditional principles of due process set forth by the Supreme Court, cumulative error warrants habeas relief only where the errors have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* (citing *Donnelly*, 416 U.S. 637, 643 (1974)).  A trial becomes so infected with unfairness when the combined effect of trial errors had a "substantial and injurious effect or influence on the jury's verdict."  *Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  Put more simply, a resulting conviction violates a defendant's due process rights when the combined effect of the individual trial errors rendered the defense "far less persuasive than it might [otherwise] have been" had the errors not been made.  *Id.* (quoting *Chambers*, 410 U.S. at 294.)  Thus, in evaluating a due process challenge based on the cumulative effect of multiple trial errors, a reviewing court must determine the relative harm caused to the defendant by the errors because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  *Id.* at 927–28 (quoting *Strickland v. Washington*, 466 U.S. 668, 696 (1984)).  However, if the evidence of guilt is otherwise overwhelming, the errors are considered harmless and the conviction will be affirmed.  *Id.*

In the present case, the evidence of Petitioner's guilt presented at trial was substantial.  Notwithstanding any of the evidence Petitioner alleges was introduced as a result of prosecutorial misconduct or trial court error, the jury would still have heard testimony: (1) from L. about the numerous occasions on which Petitioner sexually abused

her and about how Petitioner threatened to kill her if she told anyone about the incidents (*see* ECF No. 7-11 at 2–4); (2) from the pediatrician who conducted L.'s forensic examination about how the physical trauma L. suffered was the most severe trauma she had observed in a child victim of sexual abuse (*see id.* at 6); and (3) from a police officer who found numerous sex toys and pornographic videos at Petitioner's residence after L.'s sexual abuse by Petitioner was reported to the authorities (*see id.* at 5).  To the contrary, the only evidence Petitioner presented in his defense was summarized by the California Court of Appeal as follows:

> Ms. Barron, a Child Protective Services worker, interviewed L. in June 2006 in response to reports from her school of suspected physical abuse. Barron noticed L. had bruising and scratches but L. denied Ivey had caused the injuries.  Ms. Toussaint, another Child Protective Services worker, interviewed L. in May 2007 in response to reports from her school of suspected physical abuse.  L. denied Ivey had physically abused her and, in response to Toussaint's question about sexual molestation, also denied she had been sexually molested.

> Two of Ivey's sisters and a family friend, who attended a party in May 2008 at which Ivey and L. were present, testified L. appeared to interact normally with Ivey.  Another of Ivey's sisters testified she had seen Ivey and L. at family gatherings and that L. appeared to be acting normally.  At a dependency hearing in 2009, J. testified she had never seen Ivey physically abuse L.

(*Id.* at 8.)  Based on the above, the Court finds that the evidence of Petitioner's guilt was overwhelming and that the combined effect of the errors Petitioner alleges occurred during his criminal trial did not render his defense "far less persuasive than it might [otherwise] have been" had the errors not been made.  *See Chambers*, 410 U.S. at 294.  Accordingly, Petitioner has not demonstrated the California Court of Appeal's rejection of his cumulative impact claim was contrary to or an unreasonable application of clearly established federal law, and the Court therefore recommends this claim be **DENIED**.

///

///

**D.      Request for Evidentiary Hearing**

The Petition also requests that the Court "order an evidentiary hearing." (ECF No. 1 at 9.)   Evidentiary hearings in § 2254 cases are governed by AEDPA, which "substantially restricts the district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999).   The provisions of 28 U.S.C. § 2254(e)(2), included below, control this decision:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that —
>
> > (A) the claim relies on —
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> >
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

In order to determine whether to grant an evidentiary hearing, the Court must first "determine whether a factual basis exists in the record to support the petitioner's claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 669 (9th Cir. 2005) (citing *Baja*, 187 F.3d at 1078). If such factual basis does not exist, then the Court must "ascertain whether the petitioner has 'failed to develop the factual basis of the claim in State court.'" *Id.* at 669–70.

A district court's ability to conduct an evidentiary hearing was even more limited by the Supreme Court's decision in *Cullen v. Pinholster*, 563 U.S. 170 (2011). *See Stokley v. Ryan*, 659 F.3d 802, 809 (9th Cir. 2011) (noting the decision in *Pinholster* "dramatically

changed the aperture for consideration of new evidence" in federal habeas courts). Pursuant to *Pinholster*, a federal court may not consider new evidence developed at a federal court evidentiary hearing on claims adjudicated on the merits in state court unless both the standard set forth in § 2254(d) and the standard set forth in § 2254(e)(2) are satisfied. *Pinholster*, 563 U.S. at 184–85. Therefore, a court must first review the state courts' rejection of a petitioner's claims decided on the merits to determine whether a petitioner has "satisfied § 2254(d)(1)'s threshold obstacle to federal habeas relief." *Id.* at 206 (Sotomayor, J., dissenting). This review is limited to the state court record. *Id.*

Here, all of Petitioner's claims were adjudicated on the merits by the state courts. Thus, Petitioner can only proceed to develop additional evidence if either 28 U.S.C. § 2254(d)(1) or (d)(2) is first satisfied. *See Sully v. Ayers*, 725 F.3d 1057, 1076 (9th Cir. 2013) (citing *Pinholster*, 563 U.S. at 203, n.20) ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief."). For all the reasons discussed above in sections V.A.–V.C. of this Report and Recommendation, Petitioner has failed to satisfy § 2254(d). Accordingly, Petitioner's request for an evidentiary hearing is **DENIED**.

## VI. CONCLUSION

For the reasons set forth above, the Court **RECOMMENDS** that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS HEREBY ORDERED** that any party to this action may file written objections with the Court and serve a copy on all parties no later than **July 21, 2016**. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **July 28, 2016**.

The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order. *See Turner v.*

14-cv-715 MMA (JLB)

*Dunca*n, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

Dated:  June 30, 2016

Hon. Jill L. Burkhardt
United States Magistrate Judge

14-cv-715 MMA (JLB)